UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY RUSH, as the
Personal Representative of the
DERRINESHA CLAY ESTATE,

        File No. 1:13-CV-1317

    Plaintiff,

        HON. ROBERT HOLMES BELL

v.

CITY OF LANSING and
OFFICER BRIAN RENDON,

    Defendants.
_____/

## **O P I N I O N**

This is a wrongful death action by decedent Derrinesha Clay's estate to obtain damages against Defendants, the City of Lansing and Lansing Police Officer Brian Rendon. Ms. Clay died from gun-related injuries sustained after several Lansing Police Officers discovered her within a bank while the officers responded to an alarm. Plaintiff alleges state law claims for gross negligence and federal claims under 42 U.S.C. § 1983 against Defendants. Defendants move to dismiss all claims against the City for failure to state a claim upon which relief can be granted under Federal Rule of Procedure 12(b)(6). Defendants move to dismiss or, in the alternative, move for summary judgment in their favor on all claims against Officer Rendon. (ECF No. 28). Plaintiff has filed a response (ECF No. 30), to which Defendants have filed a reply (ECF No. 33). For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion.

# I. BACKGROUND

On March 14, 2011, Officer Brian Rendon responded to an alarm call at 3:30 a.m. at a Bank of America located at 3215 South Martin Luther King Boulevard in Lansing, Michigan. (Rendon Dep. 21, ECF No. 29, Ex. 3.) According to Officer Rendon, some officers were already at the scene when he arrived, including Officer Jillian Johnson and Officer David Burke. (*Id.*) Officer Rendon, a canine officer, decided not to send his canine into the bank due to glass shards from a broken window. (*Id*. at 21–22.) The Lansing Police Department sent Officers Johnson, Rendon, and Burke into the bank to discover whether anyone was inside. (*Id.* at 23.)

The three officers entered the bank through the broken window. (*Id*. at 23-24.) Some of the lights were on inside the bank, making use of a flashlight unnecessary. (*Id*. at 26; Johnson Dep. 18, ECF No. 29, Ex. 2.) Upon entering the bank, Officer Rendon made several announcements declaring the presence of the Lansing Police Department and demanding that anyone present should make himself known. (Rendon Dep. 25.) Hearing no response, the officers determined to clear the bank and ensure no unauthorized people were inside. (*Id*.) Officers Johnson and Rendon hopped over a teller counter, progressing towards a storage room where Ms. Clay had hidden herself. (*Id*.) Officer Burke remained on the other side of the counter. (*Id*.) Officer Rendon again announced the police's presence and demanded anyone inside the room to come out with hands up. (*Id*.)

Officer Rendon kicked the door to the storage room with his boot, testing to see

whether the door would bounce off the back wall of the room or against something in the room. (*Id.*) The door made a thud sound, suggesting that it bounced off something other than a wall. (*Id.*, Johnson Dep. 20.) Looking through the door, Officer Rendon saw a black coat with fur lining that was either hanging behind the door, or someone was wearing the coat behind the door. (Rendon Dep. 26.) Officer Rendon held his gun in his right hand, reached behind the door with his left hand, and grabbed the coat, which Ms. Clay was wearing. (*Id.* at 26–27.)

Ms. Clay, who was apparently 17 years old and, as Officer Johnson recalls, was a "very small" woman, was waving a pair of scissors in her hand, with the tip of the scissors pointed towards the ceiling and the officers. (Johnson Dep. 29; Rendon Dep. at 27.) Ms. Clay's middle fingers were wound through the handle of the scissors, creating a fist. (*Id.* at 27, 29–30.) Officer Rendon recalls that Ms. Clay held the scissors in her left hand, and he had hold of her right shoulder. (*Id.* at 29.) Officer Johnson recalls that Ms. Clay held the scissors in her right hand. (Johnson Dep. 21.) Although Ms. Clay was waving the scissors, she did not attempt to stab or poke Officer Rendon when he pulled her from behind the door. (Rendon Dep. 30.) Upon seeing the scissors, Officer Rendon forced Ms. Clay down to the ground with his left hand while holstering his gun again with his right hand. (*Id.* at 27–29.) Officer Johnson had hold of Ms. Clay's hand that held the scissors. (Johnson Dep. 23.)

Officer Rendon recalled that he was on Ms. Clay's right side, and Officer Johnson was located on Ms. Clay's left side. (Rendon Dep. 31.) Officer Johnson attempted to use strikes

3

known as disarming tactics to release the scissors from Ms. Clay's left hand. (*Id*. at 29; Johnson Dep. 24.) Officers Johnson and Rendon gave verbal commands to let go of the scissors, but Ms. Clay did not. (Rendon Dep. 29.) When forced to the ground, Ms. Clay was nearly on her stomach, and Officer Rendon had her right shoulder with his left hand. (*Id*. at 32.) He attempted to put her in a wrist lock or arm bar so that he could secure her hands in handcuffs behind her back. (*Id*. at 34.) Ms. Clay did not stop moving, and came up to her knees. (*Id*. at 36.)

Somehow Ms. Clay and Officer Rendon spun around while Ms. Clay got up to her knees, so that Ms. Clay was inside the room, facing the door on her knees, and Officer Rendon was standing upright on the threshold, directly facing Ms. Clay. (*Id*. at 36–37.) Officer Johnson was behind Ms. Clay inside the room. (Johnson Dep. 25.) Officer Rendon did not force Ms. Clay back down to the floor because of her close proximity to the wall. (Rendon Dep. 37.) Ms. Clay, still on her knees, apparently moved towards Officer Rendon. (*Id.* at 39.) She continued to wave the scissors, although she never attempted to stab the officers. (*Id*.) She did not respond to verbal direction to let go of the scissors. (Johnson Dep. 26.) According to Officer Johnson, Ms. Clay was frantic, shaking, and saying "I'm sorry, I'm sorry." (*Id*.) Officer Johnson had Ms. Clay's hand behind her back, and she was able to get the scissors out of Ms. Clay's hands. (*Id*. at 27; Rendon Dep. 39.)

At this point, Officer Rendon was standing upright in the doorway to the storage room, facing Ms. Clay from about an arm's length away from her with his left hand on her

4

right shoulder. (*Id*. at 40.) Because of the small size of the room, he had no room to put both hands on her. (*Id*.) Officer Johnson was behind Ms. Clay, inside the storage room. (*Id*. at 46.) Ms. Clay reached across her body and pulled a serrated steak knife from inside her coat. (*Id*. at 42–43.) Officer Rendon did not grab her hand due to his reaction time. (*Id*. at 43.) Officer Rendon yelled "knife." (*Id*. at 46.) Officer Johnson did not have control of Ms. Clay, so she decided to disengage by backing away further into the storage room. (Johnson Dep.34.)

Ms. Clay—still on her knees—slashed the knife back-and-forth in front of her, at stomach height of Officer Rendon. (Rendon Dep. 46.; Johnson Dep. 31.) She did not poke or jab the knife. (Johnson Dep. 32.) Officer Rendon released his hold on Ms. Clay's right shoulder, and in a single motion, he stepped back from her into a crouched position and pulled his gun from its holster. (Rendon Dep. 46, 52.) He fired a round of bullets into Ms. Clay's stomach area. (*Id*. at 46–47.)

While Officer Rendon was stepping back from Ms. Clay out of the room, Officer Johnson had shoved Ms. Clay towards the floor and stepped back further into the room. (Johnson Dep. 35.) Officer Johnson could no longer see Officer Rendon, so she pulled out her gun because she was uncertain whether he was in a dangerous position due to the knife. (*Id*. at 35, 42.)

At this point, Officer Rendon was approximately a foot further than arm's length away from Ms. Clay, so that Ms. Clay could have no longer reached him from her position on her knees. (Rendon Dep. 52–53, 55.) Officer Rendon testified that, immediately after he shot Ms.

5

Clay in the stomach, Ms. Clay leaned forward on her knees and jabbed at him one time with her knife. (*Id.* at. 47, 50.) Officer Rendon then shot Ms. Clay in the head. (*Id*. at 48.)

After the first shot, Officer Johnson could clearly see Ms. Clay and the knife, and she did not see Ms. Clay poke or stab at Officer Rendon. (Johnson Dep. 35–36.) Officer Johnson testified that Ms. Clay's body tensed up and fell backwards after the first shot. (*Id.* at 35, 40.) Officer Johnson could not see Officer Rendon then because he was on the other side of the threshold, but she testified that he was further than arm's length away because she could clearly see Ms. Clay. (*Id*. at 39.)

Officer Burke had hopped over the teller counter when he first heard Officer Rendon giving commands. (Burke Dep. 9.) Officer Burke witnessed Officers Rendon and Johnson struggle with Ms. Clay while she held the scissors. Officer Burke cannot recall whether he attempted to help Officers Rendon and Johnson. (*Id.* at 25) Officer Burke recalled that Ms. Clay was standing up during the struggle with the scissors, and that Officer Rendon forced her to her back. (*Id.* at 12.) He testified that she got up to her knees and brandished a knife. (*Id*. at 17.) Ms. Clay then slashed the knife side-to-side, in a downward motion, and in a forward motion towards Officer Rendon. (*Id*. at 20-22.) After Officer Rendon shot Ms. Clay, she slouched over forward from the blow to her stomach. (*Id*. at 25.) Officer Burke testified that Ms. Clay did not lunge at Officer Rendon after she was shot the first time. (*Id*.)

Plaintiff alleges a state law claim of gross negligence against Defendant Rendon for his use of force and against the City for failure to train and discipline Defendant Rendon

6

(Count I); a federal claim under 42 U.S.C. § 1983 against Defendant Rendon and the City for use of excessive force and failure to prevent excessive force in violation of Ms. Clay's Fourth Amendment rights (Count II); a claim against the City under § 1983 for failure to prevent use of force (Count III); a claim against the City under § 1983 for failure to implement and enforce guidelines on the use of force (Count IV);  a claim against Defendants for conspiracy under § 1983 (Count V); a claim against Defendants for violation of due process under § 1983 (Count VI); and a claim against the City for failure to train and supervise under § 1983 (Count VI[sic]). (Amd. Comp. 5–13, ECF No. 1.)

## II. Standard of Review

Defendants move to dismiss claims against the city based on the sufficiency of the pleadings, under Federal Rule of Procedure 12(b)(6). A Rule 12(b)(6) motion to dismiss requires the Court to "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff,'" but the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing how the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.*

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 677). The Court may consider the complaint in its entirety, documents referenced in the complaint and pleadings, matters of public record, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007).

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488

8

F.3d 397, 403 (6th Cir. 2007)).  Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III. Discussion

**A. Motion to Dismiss**

Plaintiff alleges multiple counts of negligence and deliberate indifference against the City for its failure to train its police officers in the proper use of force. (Counts II–VI, Compl.) Defendants contend that the City is entitled to dismissal, or summary judgment in the alternative, because Plaintiff has not shown that the City had a policy, custom, or history of misconduct. (Defs.' Br. 9.)

A plaintiff who sues a city and its police department must demonstrate that the acts of the individual defendant were the result of a municipal policy or custom. *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658, 690–91 (1978); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998). To establish a failure to train claim, a plaintiff must show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cty. of Summit*, 540

9

F.3d 459, 464 (6th Cir. 2008) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)) (internal quotation marks omitted). "Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." *Sova*, 142 F.3d at 904.

Here, Plaintiff's complaint includes recitations of the elements of a cause of action, with no factual support. Plaintiff has not identified any specific municipal policy, custom, training program, or supervision policy to support her claims against the City. No evidence on the record suggests that the City of Lansing or the Lansing Police Department provided inadequate training programs, nor that such a program resulted in Ms. Clay's injury. Accordingly, all counts against the City of Lansing must be dismissed under Federal Rule of Procedure 12(b)(6) because Plaintiff has failed to state a claim.

**B. Motion for Summary Judgment**

    **1. Qualified Immunity Standard**

Defendants assert that Defendant Rendon is entitled to immunity from claims of excessive force because he did not violate Ms. Clay's constitutional rights.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once the defendants plead an affirmative defense of qualified

immunity, the burden shifts to the plaintiff to "show that the official violated a right so clearly established 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 636 (6th Cir. 2013) (quoting *al-Kidd*, 131 S.Ct. at 2038).

In cases involving claims of excessive force, the Court evaluates the constitutional claim under the Fourth Amendment "objective reasonableness" test. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). That test inquires "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "the use of deadly force is only constitutionally reasonable if the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others." *Summerland v. Cty. of Livingston,* 240 F. App'x 70, 76 (6th Cir. 2007) (quoting *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005)).

Plaintiff's briefs do not focus on whether Defendant Rendon used excessive force when Ms. Clay first brandished the scissors or the serrated knife. Rather, Plaintiff contends that Defendant Rendon was not justified in using deadly force to shoot Ms. Clay in the head after he already shot her in the stomach. Plaintiff argues that Ms. Clay no longer posed a

threat of serious harm after Defendant Rendon had stepped out of her reach and had shot her in the stomach. (Pl.'s Br. 13.) Defendant Rendon contends that Ms. Clay attempted to stab him after he shot her in the stomach, although he admits that she could not reach him at that point. Officers Johnson and Burke testified that Ms. Clay did not attempt to poke or stab Defendant Rendon with the knife after she was shot in the stomach.

### a. Prong 1: Reasonableness

In the context of excessive force, the Court segments the incident to isolate the particular use of force that is allegedly excessive. *Dickerson v. McClellan*, 101 F.3d 1151, 1161–62 (6th Cir. 1996) (citing cases in which the courts "look to the split second before the officer had to decide what to do"). "[W]hether the use of deadly force at a particular moment is reasonable depends primarily on an objective assessment of the danger a suspect poses at that moment." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). The Supreme Court in *Graham* identified three factors to determine the reasonableness of force, including "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Graham*, 490 U.S. at 396.

Here, the highly probable crime of breaking and entering into a bank while armed with intent to commit larceny is particularly severe, supporting the use of force under the first factor. Under the second factor, however, the evidence does not establish that Ms. Clay continued to pose a significant threat to the officers or herself after she was shot. Ms. Clay

was a "very small" woman at approximately 125 pounds and 5'4" in height at age 17 at the time of the incident. She was positioned on her knees more than arm's length from Defendant Rendon. She had just been shot in the stomach. She was outnumbered three-to-one by the police. According to two police officers, Ms. Clay made no sudden moves to stab or otherwise injure an officer or herself. These facts suggest that Ms. Clay no longer posed an immediate threat of serious harm, a requirement under *Garner*

The second *Graham* factor favors Plaintiff because Defendant Rendon's actions are not objectively reasonable if he fired the second shot after Ms. Clay no longer posed a threat. *See Estate of Fuentes ex rel. Fuentes v. Thomas*, 107 F. Supp. 2d 1288, 1300 (D. Kan. 2000), *aff'd,* 30 F. App'x 931 (10th Cir. 2002) (where police officer shot a suspect multiple times, the court not find that the police officer's "actions were objectively reasonable because the evidence, viewed in the light most favorable to plaintiffs, is such that a rational fact-finder could infer that the defendant fired the third shot after the threat was abated."); *Nolan v. Grim*, No. 5:09CV00039, 2010 WL 4929658, at *9 (W.D. Va. Nov. 30, 2010) (denying summary judgment where a police officer shot a suspect two times because the evidence, construed in favor of the plaintiff, suggested that the suspect no longer posed a threat to the police officer's safety after the first shot).

The segmenting analysis under the third *Graham* factor also suggests that deadly force was unreasonable to deter resistance or flight. Officer Johnson testified that Ms. Clay repeatedly apologized prior to the first shooting, suggesting remorse. Although the officers

13

commanded her to drop the knife, neither verbally warned Ms. Clay that Defendant Rendon might shoot her, as required by *Garner.* 471 U.S. at 12; *Bougess*, 482 F.3d at 892. The evidence does not indicate whether Ms. Clay had sufficient time to appreciate the non-verbal threat of a pointed gun.

The testimony of the only three witnesses conflicts as to whether Ms. Clay was still "resisting" the police after Defendant Rendon shot Ms. Clay in the stomach. Defendant Rendon stated that Ms. Clay stabbed towards him, indicating active resistance. However, Officer Johnson stated that Ms. Clay tensed up and fell backwards, and Officer Burke stated that Ms. Clay slouched over. Construing the facts in favor of Plaintiff, Ms. Clay was no longer resisting according to Officer Johnson's and Burke's accounts. Thus, the third factor under *Graham* does not suggest deadly force was reasonable to prevent resistance or flight.

The *Graham* factors indicate there exists a genuine dispute whether Ms. Clay continued to pose a threat of serious physical harm after Defendant Rendon shot her in the stomach. "[E]ven when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Bougess*, 482 F.3d at 896 (emphasis in original). *See Dickerson*, 101 F.3d at 1151–62 (denying immunity where there was a disputed issue of fact as to whether a suspect, who possessed and fired a firearm minutes before the police arrived, posed a danger to officers at the time he was shot). Taking the facts in the light most favorable to Plaintiff, a jury could find that a constitutional violation occurred because Defendant Rendon used

14

excessive force when he shot Ms. Clay in the head.

### b. Prong 2: Clearly Established Right

The second prong of the qualified immunity analysis set forth in *al-Kidd* is whether the constitutional right was clearly established at the time of the officer's conduct. The right at issue is not the right to be free from excessive force, broadly defined. Rather, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) requires the right to be defined with specificity.

As established above, the evidence, construed in favor of Plaintiff, would allow a reasonable jury to conclude that Defendant Rendon's shot to Ms. Clay's head was unreasonable because she was on her knees, she had already been shot in the stomach, and she was no longer resisting. Thus, the right at issue is an arrestee's right to be free from use of deadly and gratuitous force when the arrestee has been subdued such that she is not fleeing nor threatening.

At least since *Garner* was decided in 1985, officers have been on notice that "where the suspect poses no immediate threat to the officer and no threat to others" the use of deadly force is unreasonable. 471 U.S. at 12. The Sixth Circuit has clarified and defined the outer limits of reasonable force by repeatedly recognizing "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). Likewise, "there are a number of cases explicitly addressing the illegality of using 'non-lethal, temporarily incapacitating force [] on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not

15

resisting arrest.'" *Wells*, 538 F. A'ppx at 638 (quoting *Michaels*, 539 F. Supp. 2d at 985–86) (collecting cases). If the right to be free from nonlethal force such as pepper spray or tasing was clearly established by 2008, then, by logical extension, the right to be free from lethal force was undoubtedly established by these events in 2011. *See Wells,* 538 F. App'x at 639.

Viewing the facts in the light most favorable to Plaintiff, Defendant Rendon's second shot to Ms. Clay's head was not objectively reasonable and constituted excessive force. Her right to be free from such force was clearly established by law at that time. Accordingly, Defendant Rendon is not entitled to summary judgment on the basis of qualified immunity on the § 1983 claims of deliberate indifference.

**2. Gross Negligence**

Defendants assert that the facts alleged to support Plaintiff's state law claim constitute assault and battery, not gross negligence as alleged. Assuming an intentional tort theory, Defendants argue that Defendant Rendon is entitled to immunity under the standard set forth in *Odom v. Wayne County*, 760 N.W.2d 217 (2008).

Government employees can be held liable under Michigan tort law for gross negligence, defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws 691.1407(8)(a). However, Michigan courts have "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004); *see also Sudul v. City of Hamtramck*, 562 N.W.2d 478, 479 (1997). The Court agrees

with Defendants that Plaintiff's allegations constitute an intentional tort of assault and battery. Plaintiff claims that Defendant Rendon "decided to shot [sic] and kill her." (Pls.' Br. 6.) A decision to shoot and kill is intentional. *See Latits v. Phillips*, 826 N.W.2d 190, 196–97 (Mich. Ct. App. 2012) (dismissing the plaintiff's gross negligence claim as an attempt at "artful pleading" where the defendant police officer decided to point and shoot). Thus, Plaintiff's claim is one for an intentional tort.

As discussed in *Odom*, the standard for establishing qualified immunity differs with respect to negligent and intentional torts. 760 N.W.2d at 228. In *Odom*, the Michigan Supreme Court determined whether governmental immunity applied to intentional torts such as assault and battery by applying the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (1984). *Odom,* 760 N.W.2d at 228; *see also Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). Under the *Ross* test, an employee is immune from suit if (1) the employee undertook the acts during the course of employment and the employee reasonably believed he was acting within the scope of his authority; (2) the acts were undertaken in good faith and without malice; and (3) the acts were discretionary, and not ministerial. *Odom*, 760 N.W.2d at 228.

The issue in dispute is whether Defendant Rendon was acting in good faith and without malice when he shot Ms. Clay the second time. "The good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious

17

intent." *Id*. at 229. Defendant Rendon's unrebutted testimony indicates that he was in fear for his life while Ms. Clay wielded her knife before he shot her the first time. (Rendon Dep. 61.) He testified that he thought that Ms. Clay was in a position to stab him when he fired on her the second time. (*Id*. 54–55.) Plaintiff has not set forth facts or allegations that cast doubt on Defendant Rendon's testimony. Therefore, Defendants have satisfied their burden in demonstrating that Defendant Rendon is entitled to immunity under *Ross* as to Plaintiff's state law claims.

## IV. Conclusion

For the reasons stated above, the City of Lansing will be dismissed with prejudice from this suit under Federal Rule of Procedure 12(b)(6). The Court will grant summary judgment as to Defendant Brian Rendon as to all state law claims. The Court finds that Defendant Rendon is not entitled to qualified immunity as to his conduct in shooting Ms. Clay a second time. Thus, the Court will deny summary judgment as to Defendant Brian Rendon on Plaintiff's § 1983 claim of deliberate indifference.

An order shall follow in accordance with this opinion.

Date:  February 13, 2015                                     /s/ Robert Holmes Bell
                                                                                           ROBERT HOLMES BELL
                                                                                           UNITED STATES DISTRICT JUDGE